UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CIVIL NO. 06-187-REW

OUDIA RIGNEY, as Administratrix
of the estate of Paul Ray Rigney, Sr.                                       PLAINTIFF


VS:                              OPINION AND ORDER

CHARLES MARCUM, individually,
and in his official capacity as Clay County
Jailer, as agent, servant, and employee of
the Clay County Detention Center and the
Clay Fiscal Court; BILL ED SIZEMORE,
individually, and as agent, servant, and
employee of the Clay County Detention
Center and the Clay Fiscal Court; JAMES
GARRISON, individually, and in his official
capacity as the Clay County Judge Executive,
and as agent, servant, and employee of
the Clay Fiscal Court; and the CLAY
FISCAL COURT                                                        DEFENDANTS

*   *   *   *   *

Paul Rigney, Sr., was a state inmate housed at the Clay County Detention Center ("CCDC")

post-conviction and sentencing.   Rigney entered the CCDC on April 29, 2005 and died at

Manchester Memorial Hospital five days later, after jail employees found him unresponsive on his

cell floor on May 3.  Plaintiff Oudia Rigney, the decedent's wife and estate administratrix, filed suit

premised on Paul Rigney's purportedly inadequate medical care at the CCDC, and subsequent death.

*See* DE# 1 Complaint.  The complaint alleges violation of 42 U.S.C. § 1983 by cruel and unusual

punishment under the Eighth and Fourteenth Amendments; state law wrongful death; and state law

negligence and vicarious liability.  *See id.* Counts I, II, III.  The named Defendants in this matter are

1

Charles Marcum, in his individual and official capacity as Clay County Jailer, Bill Ed Sizemore, individually and as an agent of the CCDC, James Garrison, in his individual and official capacity as Clay County Judge Executive, and the Clay Fiscal Court.[1]  *See id.*

Pursuant to the parties' agreement under 28 U.S.C. § 636(c), the District Court assigned the case to this Court for all proceedings and final disposition.  *See* DE## 20 & 21.  The action is now before the Court on Defendants' motion for summary judgment.  *See* DE# 60.

Having received and considered Defendants' motion, Plaintiff's response in opposition, and Defendants' reply, the matter is ripe for decision.  *See* DE## 60, 76, 79.  For the reasons stated herein, and after a full analysis of the record and applicable law, the Court GRANTS Defendants' motion for summary judgment as to the § 1983 claims.   Based on the legal and factual posture of the federal claims presented, against these Defendants, there simply is not a genuine issue of material fact warranting trial.  The Court, in its discretion, declines supplemental jurisdiction over the state law causes of action and dismisses such claims without prejudice.

---

[1]

The Complaint also names "unknown defendants."  *See* DE# 1.  Plaintiff had moved for appointment of a warning order attorney, but the District Court denied the motion.  *See* DE# 2; DE# 10 Order at 2.  The Court directed Plaintiff to use "John Doe" defendants and then name the specific individuals as identified through discovery.  *See id.* at 1-2.

Plaintiff, however, never amended the complaint to reflect discovered identities.  The omission is significant, considering that only a small number of CCDC employees or other persons could have had contact with Rigney during his five-day detention.  Under the circumstances, it should not have been difficult to identify any relevant "unknown" parties.  Moreover, Plaintiff offers no explanation for the failure to name actual CCDC employees after completing discovery, even though Defendants' summary judgment motion raised the issue.  *See Petty v. County of Franklin*, 478 F.3d 341, 345-46 (6th Cir. 2007).

Obviously, unidentified and unknown Defendants are not before the Court.  Furthermore, a constructive-notice theory would not apply in this case because Plaintiff never substituted real persons.  *See Petty*, 478 F.3d at 345-46 & n.2.

## I.  Relevant Facts

Paul Rigney pled guilty to state drug trafficking charges in Harlan Circuit Court on March 15, 2005.  The Harlan Circuit Court sentenced Rigney on April 29, and he arrived at the CCDC (which houses state inmates in certain circumstances) in state custody that afternoon.  The Court chronicles, in detail, Rigney's detention at the CCDC based on the testimony and material in the record.[2]

### Friday April 29

- Rigney had active prescriptions when he entered state custody.  Because of prior mining accidents, Rigney received Lorcet (hydrocodone) for pain and Xanax for anxiety.  *See* DE# 64 Oudia Rigney Dep at 23-24.  In addition, Rigney had been diagnosed with hypertension. *See id*. at 25.  Rigney's high blood pressure medication included Atenolol, Micardis, and HCTZ.  *See id*. at 26; *see also* DE# 64 Exhibit 2.  Rigney also had inhalers for a respiratory condition.  *See* DE# 64 Oudia Rigney Dep at 22-23; *see also* DE# 64 Exhibit 2.  Rigney also was an alcoholic.  *See* DE#59 Exhibit 1 (assessment of PA Will Miller, diagnosing "alcoholism").  Rigney's alcohol habit included from 15 to 24 beers per night.  *See id*.; *see also* DE# 64 Oudia Rigney Dep at 29 (describing Rigney's alcohol intake at 18-24 beers daily).

- According to Plaintiff, Rigney received his battery of medication prior to sentencing on Friday morning.  *See id*. at 32.  After the hearing, Plaintiff provided a supply of medication and the prescription information to a Harlan deputy sheriff, in addition to Rigney's other personal items.  *See id*. at 33-34.  Plaintiff explained that she had collected the information from Rigney's doctors in advance.  Plaintiff testified that she witnessed a Harlan deputy sheriff load the packaged medication, with Rigney's other belongings, into the vehicle that transported Rigney to the CCDC.  *See id*. at 33.  Plaintiff also claims that a Harlan Detention Center employee informed her that three days of medications and the prescription information accompanied Rigney to the Clay County Detention Center.  *See id*. at 35-36.

- Rigney arrived at the CCDC at approximately 3:00 p.m.  *See* DE# 69 Exhibit 7 (CCDC Inmate Receipt Form).  Deputy Jailer Charles Darnald processed Rigney.  *See* DE# 68 Darnold Dep at 3-4.  He searched Rigney, collected Rigney's personal data, and administered a medical questionnaire.  *See id*.  Darnald himself read the questionnaire to Rigney.  *See id*. at 4.  Rigney affirmatively responded that he had "medical problems that the

---

[2]

As the analysis will show, not all of the summarized record involves admissible evidence.

Jail should be aware of," and that he has prescription medications "that need to be continued." *See id.* at 4-5; DE# 68 Exhibit 5 (Medical Questionnaire). Although both questions prompted an explanation, the questionnaire featured no additional information. Darnald likewise recalled no conversation concerning Rigney's medical conditions. *See* Darnald Dep at 4-5. He explained that the inmates generally prefer to discuss health issues with the medical staff directly, although the CCDC medical staff never actually saw the questionnaire or Rigney's responses in this case. *See id.* at 5; DE# 59 Baker Dep at 31-32; DE# 54 Jones Dep at 4. According to the questionnaire, Rigney also reported no previous withdrawal symptoms from alcohol or drugs. Last, the questionnaire reflects that Rigney knew and understood that he could "request to see the medical staff at anytime." *See* DE# 68 Exhibit 5 (Medical Questionnaire). Deputy Jailer Tracy Allen booked Rigney to C-cell, which housed the other state inmates. *See* DE# 69 Exhibit 6 (Rigney Personal Information Sheet).

-   Deputy Jailer Darnald could not recall whether he received Rigney's prescriptions and medical information when Rigney arrived. *See* DE# 68 Darnald Dep at 8-9. However, he and other CCDC personnel explained that medicines and medical records go directly to the medical staff.[3] *See id.* CCDC Nurse Alma Baker received Rigney's medication on Friday afternoon. *See* DE# 59 Baker Dep at 13; DE# 59 Exhibit 1 (Inmate Progress Report). Baker prepared and maintained a progress report for Rigney. According to the report, Rigney's medications contained "several samples" that had "no name" and "no directions." *See* DE# 59 Exhibit 1 (Inmate Progress Report). The unlabeled medication included Micardis and Vioxx. *See* DE# 59 Baker Dep at 13; Exhibit 1 (Inmate Progress Report). Rigney's inhalers, ear drops, Xanax, hydrocodone, and Metoprolol did have instructions. *See* Baker Dep at 13; DE# 59 Exhibit 1 (Inmate Progress Report). Baker determined to "follow up" on the unlabeled medications with Dr. Becknell, and she also withheld Rigney's Xanax "due to jail policy."[4] *See* Baker Dep at 13; DE# 59 Exhibit 1 (Inmate Progress Report). The progress

---

[3]

During Rigney's incarceration, the CCDC medical staff included Dr. W.E. Becknell, Alma Baker, and Donna Jones. Dr. Becknell made regular visits to the CCDC on Mondays and Fridays, and he was also on-call. *See* DE# 59 Baker Dep at 9-10. Alma Baker was a full-time LPN. *See id.* at 2. Baker generally worked Mondays through Fridays from 8:00 a.m. until 4:00 p.m., but she provided additional on-call support as needed. *See id.* at 8-9. The CCDC hired Jones to assist the medical staff. *See* DE# 54 Jones Dep at 2-3. Prior to the CCDC, Jones had no training or employment in the medical field. *See id.* at 3, 23. Jones started on Tuesday, April 26, 2005, only three days before Rigney arrived. *See id.* at 18. She worked Mondays, Tuesdays, and Fridays, in addition to the weekends. *See id.* at 4, 13.

[4]

Pursuant to Dr. Becknell's standing orders, CCDC medical staff could administer "home medications" only "as ordered on [the] bottle by their physician or sent in by their physician." *See* DE# 59 Exhibit 4 (Standing Orders). According to Baker, CCDC policy prohibited inmates from receiving narcotics and Xanax. *See* DE# 59 Baker Dep at 14-15. Although Xanax itself is non-

4

report indicates that the CCDC received no other medical records besides Rigney's labeled and unlabeled medications. Neither Dr. Becknell or Alma Baker actually saw Rigney on April 29. *See* Baker Dep at 14. Donna Jones, however, recalled that she administered Rigney's ear drops on Friday night. *See* DE# 54 Jones Dep at 5.

- Rigney called Plaintiff at approximately 8:00 p.m. Plaintiff explained that Rigney sounded coherent but upset and "shaky." Rigney reported to Plaintiff that he felt ill because he had not received his medication. *See* DE# 64 Oudia Rigney Dep at 40-41. Plaintiff called the CCDC about the matter, but the CCDC provided no information. *See id*. at 42. Plaintiff spoke to Rigney again at approximately 10:30 p.m. Rigney reported that he still had not received his medication. He stated that he continued to feel ill and would try to sleep.[5] *See id*. at 43-44.

*Saturday April 30*

- The following morning Rigney submitted a medical request form. *See* DE# 54 Jones Dep at 7-8; DE# 54 Exhibit 1 (Medical Request Form). Inmates must complete the medical request form unless the prisoner is physically unable. In this case, it is unclear whether Rigney himself filled out the form. *See* Jones Dep at 7-8.

- According to Jones, Rigney started "shaking" on Saturday. *See id*. at 8. Jones called Baker at home, and Baker instructed Jones to administer Benadryl.[6] *See id*. at 8-9. Based on Jones's handwritten notes, Jones administered Benadryl at 10:15 a.m., 4:00 p.m., and she directed the night shift to administer Benadryl at 9:00 p.m. *See* DE# 59 Exhibit 1 (Medical Request Form); Baker Dep at 22.

- Plaintiff telephoned the CCDC two or three times on Saturday. Plaintiff asked about Rigney's medication, but again the CCDC provided no information. Although Plaintiff requested that Rigney call home, Rigney did not return Plaintiff's phone call that day. *See* DE# 64 Oudia Rigney Dep at 45-46.

---

narcotic, Baker explained that Jailer Charles Marcum "didn't like the drug." *See id*.

[5]

According to Plaintiff, Rigney informed CCDC employees on Friday that he needed his medication. *See* DE# 64 Oudia Rigney Dep at 41.

[6]

Doctor Becknell's standing orders authorized CCDC medical staff to administer Benadryl for "DT's." *See* DE# 59 Exhibit 4 (Standing Orders).

*Sunday May 1*

- Rigney did call Plaintiff on Sunday morning. Rigney reported that he was "sick" and still had not received his medication. According to Plaintiff, Rigney could "barely talk" and was "upset." *See id*. at 46. He told Plaintiff that he "ain't going to make it in here" without his medicine. *See id*. Rigney instructed Plaintiff to contact Curt Stallard, the Harlan County Jailer. He hoped Stallard could do "something, or talk to somebody" about the situation.[7] *See id*.

- Plaintiff also visited the CCDC on Sunday afternoon. Plaintiff and Rigney's son arrived at approximately 1:00 p.m. *See id*. at 49. However, Donna Jones and another CCDC employee subsequently informed Plaintiff that Rigney was unable to visit. *See id*. at 50; DE# 54 Jones Dep at 12-13. Jones did not discuss Rigney's condition with Plaintiff. *See* Rigney Dep at 50-51; Jones Dep at 13. Before leaving, Rigney's son decided to visit another CCDC inmate, Steve Perry. Perry had accompanied Rigney to the CCDC from the Harland Detention Center. Perry allegedly explained to Rigney's son that Rigney "was in really bad shape" and was not getting his medications. *See* Rigney Dep at 51-52.

- Sometime on Sunday, Donna Jones moved Rigney to an observation cell due to "withdrawal."[8] *See* DE# 54 Jones Dep at 5; DE# 56 Exhibit 1 (Incident Report reflecting that Rigney was moved to observation cell on Sunday morning); DE# 69 Exhibit 6 (Rigney Personal Information Sheet reflecting that Rigney was moved to observation cell on Sunday afternoon); DE# 65 Exhibit 3 (Observation Log reflecting same). Jones testified that Rigney

---

[7]

Plaintiff explained that Curt Stallard and Rigney's father, Dillard Rigney, were close friends. *See* DE# 64 Oudia Rigney Dep at 46. According to Plaintiff, Dillard Rigney contacted Stallard on Sunday. Stallard promised that he would check into the matter. *See id*. at 47-48.

Per Plaintiff's testimony, a few days after Rigney passed, Stallard told Plaintiff that he had called the CCDC prior to Rigney's death and spoken to Chief Deputy Jailer Bill Ed Sizemore. Stallard allegedly explained that he was checking on Paul Rigney, a family friend, and that Rigney needed his blood pressure medication. *See id*. at 101. Sizemore purportedly told Plaintiff that the CCDC "was his jail and he would run it his way, and [Stallard] needed to run his jail his own way." *See id*.

The parties did not depose Stallard, and Plaintiff postponed Bill Ed Sizemore's deposition without addressing the allegation. *See* DE# 75 Bill Ed Sizemore Dep. No other evidence exists documenting the alleged phone call between Stallard and Sizemore. Jailer Charles Marcum also reported no contact with the Harlan County Jailer regarding Rigney, and he was unaware of any such communication between Stallard and Sizemore. *See* DE# 53 Charles Marcum Dep at 36-37.

[8]

The observation room is designated for ill inmates. The room has large glass walls and is located at the front of the facility near booking. The front desk maintains a log book. CCDC guards must document the inmate's status every fifteen to twenty minutes.

was "jerking" and "shaking really bad." *See* Jones Dep at 5. Jones believed that the shaking had intensified since Saturday, and she feared that Rigney might hurt himself in a regular cell. *See id*. at 5, 8-9. Rigney told Jones that he "needed a Xanax." *See id*. at 6.

-   Between 2:00 and 3:00 p.m., the observation log reflects that Rigney started talking to himself, hitting the door, and striking the cell window. *See* DE# 65 Exhibit 3 (Observation Log); DE# 55 Grubb Dep at 7,9. At about 3:30 p.m., Rigney broke the cell window with a plastic cup. *See* DE# 55 Exhibit 1 (Incident Report reflecting Rigney broke cell window); Grubb Dep at 6, 9-10. CCDC officials responded and secured Rigney in a "restraint chair," for Rigney's own safety. *See* DE# 65 Durham Dep at 15. Rigney again began talking to himself, yelling, and hitting the door between 8:00 and 9:30 p.m. *See* DE# 65 Exhibit 3 (Observation Log); DE# 70 Terry Dep at 11.

-   At some point (and the date is unclear), Deputy Jailer Jason Durham testified that Rigney soiled himself. No one documented that incident in the observation log. *See* DE# 65 Durham Dep at 10-11, 20. Based on Durham's testimony, this appears to have occurred on May 1. *See id*. at 20. Durham indicates that CCDC personnel would have taken Rigney to the shower and provided a fresh jumpsuit. *See id*. at 11.

-   Jones also called Nurse Baker to discuss Rigney's condition. Baker instructed Jones to administer Benadryl and advised Jones to send Rigney to the emergency room if Jones was "uncomfortable." *See* DE# 54 Jones Dep at 23-25; DE# 59 Baker Dep at 11, 25-27, 46-47. Jones next relayed Rigney's condition to Jailer Charles Marcum. *See* Jones Dep at 24-25. She told Marcum that Rigney was "shaking really badly." *See id*. at 10, 24-25. However, Jones stated that only Rigney's "hands" were shaking, and even then, he would have been able to hold a cup of coffee despite the shaking. *See id*. at 12. Marcum determined that Rigney should remain at the CCDC overnight, and that Dr. Becknell would see Rigney on Monday morning.[9] *See id*. at 10. Jones reported Marcum's decision to Baker, and Baker assured Jones that Dr. Becknell would see Rigney the following morning. *See* Baker Dep at 11, 25.

-   According to Jones's handwritten notes, Jones again scheduled Benadryl at 8:30 a.m., 3:30 p.m., and at 9:30 p.m on Sunday May 1. *See* DE# 54 Exhibit 1 (Medical Request Form). However, the CCDC staff did not administer the 3:30 and 9:30 batteries because Rigney's condition was "too bad." *See id*. Sometime after 9:00 p.m., CCDC staff moved Rigney to a "dry cell."[10] *See* DE# 69 Exhibit 6 (Rigney Personal Information Sheet).

---

[9]

Marcum himself could not recall a conversation with Donna Jones regarding Paul Rigney. *See* DE# 53 Charles Marcum Dep at 53-54.

[10]

The dry cell, also referred to as the "drunk tank," is an empty room located at the front of the facility by the observation cell.

- Plaintiff called the CCDC on Sunday night.  The CCDC official explained that Rigney could not speak at that time.  The employee told Plaintiff that Rigney had been moved to another cell and that he would see a doctor on Monday.  *See* DE# 64 Oudia Rigney Dep at 54.

*Monday May 2*

- Dr. Becknell evaluated Rigney on Monday morning.  *See* DE# 59 Baker Dep at 25-26; DE# 54 Jones Dep at 26.  Baker and Jones both assisted.  Baker recorded Rigney's condition and vital signs, which appeared normal.  *See* Baker Dep at 48; *see also* Jones Dep at 26.  Baker remarked on the evaluation form that Rigney was "agitated" and mumbling.  *See* DE# 59 Exhibit 2 (Evaluation Form); *see also* Baker Dep at 15, 37.  The form also noted Rigney's "violent behavior" on Sunday May 1.  *See* DE# 59 Exhibit 2 (Evaluation Form).  Doctor Becknell diagnosed Rigney with hypertension and he also suspected possible withdrawal, based on Rigney's medications, history, and symptoms.  *See id.*; Baker Dep at 38-39.  Dr. Becknell instructed Baker to continue the Metoprolol and inhalers; to hold the Xanax and unlabeled Micardis until the CCDC received Rigney's medical records;[11] and to follow the standing orders for withdrawal.  *See* DE# 59 Exhibit 2 (Evaluation Form); *see also* Baker Dep at 26.  Dr. Becknell did not recommend additional medical treatment.  *See* Baker Dep at 15, 47-48; Jones Dep at 26.  According to Baker, Doctor Becknell believed that Rigney's condition would improve in three to four days.  *See* Baker Dep at 15.  Based on Rigney's vital signs, Baker also believed that further medical attention would have been unnecessary.  *See id.* at 48.

- Plaintiff contacted the CCDC twice after Rigney's examination.  The CCDC reported that Rigney's vital signs were good.  The CCDC assured Plaintiff that Rigney was on "24 hour watch" and that a doctor was on-call.  *See* DE# 64 Oudia Rigney Dep at 55-56.  Plaintiff next contacted a representative with the Department of Corrections Division of Community Services.  Plaintiff complained that Rigney was not receiving his medication, was having withdrawal, and that the CCDC would not provide information.  *See id.* at 57-58.

- Deputy Jailer Bill Brumley's shift started at 9:46 p.m. on Monday, May 2.  His testimony indicated no change in Rigney's condition.  According to Brumley, Rigney continued to shake and mumble on Monday night.  *See* DE# 67 Brumley Dep at 6-7.

---

[11] According to Baker, Plaintiff had implied to Donna Jones on Sunday that she would send Rigney's records.  *See* DE# 59 Baker Dep at 26; *see also* DE# 59 Exhibit 1 (Inmate Progress Report).

*Tuesday May 3*

- Deputy Jailers Roy Butler and Elbert Henson served breakfast to Rigney at 7:00 a.m. on Tuesday morning, but Rigney did not eat. *See* DE# 73 Roy Butler Dep at 15; DE# 65 Exhibit 3 (Observation Log). At about 8:00 a.m., Butler and Paul Busby assisted Rigney to the shower. Butler and Busby placed Rigney in a chair and turned on the water. Because Rigney was "weak," Butler himself actually had to bathe Rigney. *See* Roy Butler Dep at 5-6. After the shower, Butler and Busby helped Rigney into a jumpsuit. *See id*. at 17.

- CCDC Nurse Alma Baker visited Rigney at approximately 9:30 a.m. According to the progress report entry, Rigney "appeared much improved," although "still shaky." *See* DE# 59 Exhibit 1 (Inmate Progress Report); *see also* DE# 59 Baker Dep at 16-17, 49. The report reflects that Rigney was responsive, drinking water, and that he took his medication without difficulty. *See* DE# 59 Exhibit 1 (Inmate Progress Report); Baker Dep at 16-17, 49. Baker believed that Rigney was "out of the woods." *See* Baker Dep at 17.

- Plaintiff contacted the CCDC at about 9:40 a.m. and spoke to Nurse Baker. Baker reported that Rigney had been bathed and that Rigney's condition was improved. Baker explained that Rigney was responsive and coherent. *See* Baker Dep at 16; DE# 64 Oudia Rigney Dep at 59.

- At approximately 11:30 a.m., Chief Deputy Jailer Bill Ed Sizemore entered Rigney's cell and found Rigney unresponsive. *See* DE# 56 Exhibit 2 (Incident Report). Deputy Jailer Roy Butler was in booking at the time, which was near Rigney's cell. Butler recalled that Sizemore summoned the nurse and an ambulance. *See* DE# 73 Roy Butler Dep at 10. Baker arrived at the scene and started CPR. According to Baker, Rigney had a faint pulse, but no respiration. Baker also requested an ambulance. *See* DE# 59 Baker Dep at 28-29. EMTs arrived at 12:14 and transported Rigney to Manchester Memorial Hospital.

- Bill Ed Sizemore ordered Richard Butler to follow the ambulance. *See* DE# 74 Richard Butler Dep at 11. Richard Butler was the CCDC maintenance/repair man. Butler knew nothing about the incident or Rigney's condition, and he provided no information to the hospital staff concerning Rigney's medical history. *See id*. at 8, 14-15.

- Rigney arrived at Manchester Memorial unresponsive at approximately 12:30 p.m. He was pronounced dead nearly one hour later, at 1:29 p.m. Hospital records reflect "sudden death, most likely cardiac." *See* DE# 1 Exhibit 3 (Hospital Records).

- After Rigney's death, the CCDC received Rigney's medical records at about 4:00 p.m. on Tuesday afternoon. *See* DE# 57 Rodney Sizemore Dep at 23; DE# 59 Baker Dep at 53-54. Rigney's attorney had faxed the documents. Plaintiff claims that the faxed medical records were the same materials that should have accompanied Rigney to the CCDC on Friday April 29. *See* DE# 64 Oudia Rigney Dep at 108.

9

On June 1, 2005, the state medical examiner's office issued its autopsy report. Doctor John C. Hunsaker III performed the autopsy. Dr. Hunsaker's report identified "natural causes" as the manner of death. *See* DE# 1 Exhibit 4 at 1 (Autopsy Report). He essentially concluded that Rigney "died as a result of complications of hypertension." *See id.* at 3. The report formally provided:

> CAUSE OF DEATH:          ACUTE CARDIAC DYSRHYTHMIA
>
> DUE TO:                  HYPERTENSIVE HEART DISEASE

*See id.* at 1. Dr. Hunsaker stated that the conditions that led to Rigney's death were longstanding and preexisted Rigney's detention at the CCDC. *See* DE# 58 Dr. Hunsaker Dep at 26-29, 34-35, 52-53.

Plaintiff, however, highlights the postmortem toxicology results. The autopsy report states: "According to some references, the concentration of [Benadryl] is supratherapeutic and near toxic levels." *See* DE# 1 Exhibit 4 at 3 (Autopsy Report). Dr. Hunsaker unequivocally excluded the toxicology finding, relative to Benadryl, as a cause of Rigney's death.[12] *See* Hunsaker Dep at 64 ("I did not consider toxicity caused by [Benadryl] to be a contributory factor in [Paul Rigney's] death."); *see also id.* at 46-47. The toxicology tests detected no other chemicals in Rigney's blood stream. Thus, Plaintiff also thereby infers that the CCDC did not actually administer any of Rigney's medications. Dr. Hunsaker did not address this issue in his deposition.

---

[12] Indeed, only "some" references actually indicated that the concentration of Benadryl was "near" toxic. *See* DE# 1 Exhibit 4 at 3 (Autopsy Report). Moreover, "toxic" is not synonymous with "lethal." According to Dr. Hunsaker, toxic concentration levels are associated with adverse side effects–not death. *See* DE# 58 Dr. Hunsaker Dep at 47-48.

As to jail training issues, the record reflects that CCDC employees received sixteen hours of training each year.[13] State law mandated the annual training sessions. *See* 501 KAR 3:040 § 4(2). The employees indicated that the training addressed inmate health and medical issues, although some employees could not confirm whether the sessions specifically discussed detoxification and alcohol/drug withdrawal.[14] It appears that CCDC employees are also CPR certified,[15] in accordance with the CCDC's official policy. *See* DE# 53 Exhibit 2 (Policy VIII-100 ¶ 2).

Finally, the parties dispute whether the CCDC medical staff or its employees could obtain emergency medical attention without first consulting Jailer Charles Marcum. The CCDC manual formally provides that the nurse's "instructions shall be followed," and that medical complaints "shall be referred according to the facility's nurse . . . to the appropriate hospital emergency room for immediate examination/treatment." *See* DE# 53 Exhibit 2 (Policy VII-300 ¶ 3). In addition, the manual instructs detention officers to "comply with the facility's nurse instructions" in emergencies. *See id.* (Policy VIII-400 ¶ 5).

---

[13]

*See* DE# 53 Charles Marcum Dep at 23; DE# 54 Jones Dep at 2; DE# 55 Grubb Dep at 4; DE# 56 Elbert Henson Dep at 2; DE# 66 Sowders Dep at 12; DE# 67 Brumley Dep at 3; DE# 68 Darnald Dep at 2; DE# 69 Allen Dep at 7; DE# 70 Terry Dep at 4; DE# 72 Shepherd Dep at 17; DE# 73 Roy Butler Dep at 13-14; DE# 74 Richard Butler Dep at 5-6; DE# 75 Bill Ed Sizemore Dep at 8.

[14]

*See* DE# 54 Jones Dep at 3; DE# 56 Elbert Henson Dep at 3; DE# 66 Sowders Dep at 12; DE# 69 Allen Dep at 7; DE# 72 Shepherd Dep at 18.

[15]

*See* DE# 53 Charles Marcum Dep at 24; DE# 56 Elbert Henson Dep at 11; DE# 65 Durham Dep at 24; DE# 66 Sowders Dep at 9; DE# 68 Darnald Dep at 12; DE# 70 Terry Dep at 4; DE# 71 Billy Jo Henson Dep at 15-16; DE# 72 Shepherd Dep at 18.

11

Despite the CCDC's formal policy, former CCDC Nurse Alma Baker explained that she actually needed the jailer's permission to send an inmate to the ER. *See* DE# 59 Baker Dep at 10, 27. According to Baker, Marcum usually asked Baker to "wait awhile," without denying a request for emergency medical treatment directly. *See id*. at 27, 43, 45. Marcum's repeated "interference" eventually led to Baker's immediate resignation. *See id*. at 27-28, 42, 55. In an incident after Rigney's death, Baker quit in frustration and told Marcum that he "don't need a nurse" when Marcum delayed medical attention for an inmate who had overdosed. *See id*. at 27-28. Donna Jones also stated that outside medical treatment required Marcum's approval. *See* DE# 54 Jones Dep at 10, 17. Some CCDC guards likewise believed that the jailer or chief deputy jailer had to authorize emergency medical treatment. *See* DE# 55 Grubb Dep at 10-11; DE# 66 Sowders Dep at 9-10; DE# 72 Shepherd Dep at 21.

Marcum, however, stated that CCDC officials "always" deferred to the doctor or nurse's assessment. *See* DE# 53 Charles Marcum Dep at 57-58. Other CCDC guards believed that medical support could be contacted without Marcum's approval under urgent and serious circumstances. *See* DE# 56 Elbert Henson Dep at 9; DE# 65 Durham Dep at 12, 24; DE# 67 Brumley Dep at 17-18; DE# 68 Darnald Dep at 12; DE# 69 Allen Dep at 8; DE# 70 Terry Dep at 5; DE# 73 Roy Butler Dep at 14. Indeed, Nurse Baker once requested emergency medical attention without consulting Marcum for an inmate having seizures, and it appears that Baker also requested an ambulance for Rigney without seeking Marcum's permission. *See* DE# 59 Baker Dep at 46.

Based on the described events, the complaint alleges deliberate indifference to Paul Rigney's Eighth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983, wrongful death, and

negligence and vicarious liability.  The wrongful death and negligence claims are state law causes of action.  Defendants move for summary judgment on all claims.

## II.  Standard of Review

Plaintiff's § 1983 claim invokes the Court's federal question jurisdiction, per 28 U.S.C. § 1331.  Section 1367 potentially confers supplemental jurisdiction over Plaintiff's state law causes of action.  *See* 28 U.S.C. § 1367.  In federal civil cases, Rule 56(c) governs all claims on summary judgment.  *See*, *e.g.*, *Smith v. Franklin County*, 227 F.Supp.2d 667, 674 (E.D. Ky. 2002)(applying Rule 56 standard to federal and supplemental state law claims).

Per Rule 56, a federal court properly grants a summary judgment when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law.  The moving party has the initial burden of establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2553 (1986).  The nonmoving party must thereafter produce specific facts demonstrating a genuine issue for trial.  *See id.*

There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S.Ct. 1348, 1356 (1986).  Likewise, judgment as a matter of law is appropriate where the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which the nonmoving party has the burden of proof.  *See Celotex Corp.*, 106 S.Ct. at 2552.

Further, "The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Deters v. Rock-Tenn Co.*, 2007 WL 2404515,

13

at *5 (6th Cir. Aug. 22, 2007).  Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley,* 385 F.3d 683, 689-90 (6th Cir. 2004). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law.  *See id*. at 451-52.

Notably, "The district court is not required to search the record to determine whether genuine issues of material fact exist where the nonmoving party has failed adequately to respond to a summary judgment motion."  *See Young v. City of Cleveland,* 2000 WL 924590, at *2 (6th Cir. June 26, 2000);  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the trial court may rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir.1992). "If the role of the trial court was not limited in this way, the trial court would be compelled to search all the materials submitted for genuine issues of material fact, develop legal theories and generally champion the position of the nonmoving party." *Young*, 2000 WL 924590, at *2 (citing *Guarino*, 980 F.2d at 405-07).

## III.  Analysis

The Court begins the analysis by noting that this is a difficult case with a lengthy and complicated record.  The posture of the case necessarily permits only evaluation of Plaintiff's claims against the actual party-Defendants.  Further, the Court must assess the record without regard to the extensive hearsay reflected in Plaintiff's briefing.  Finally, as a case in which medical issues are

14

central, the lack of expert proof on the critical causation and toxicological questions significantly affects the Court's assessment of the case.

*42 U.S.C. § 1983*

Medical care of prisoners implicates the Eighth Amendment. *See Farmer v. Brennan*, 114 S.Ct. 1970, 1976 (1994). Constitutionally deficient medical treatment can result in liability via § 1983, which creates a private right of action against any person who, under color of state law, violates the constitutional rights of another. *See Scicluna v. Wells*, 345 F.3d 441, 444 (6th Cir. 2003). The Supreme Court announced the general standard for an Eighth Amendment claim in *Estelle*, stating:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment.

*Estelle v. Gamble*, 97 S.Ct. 285, 291 (1976)(citation omitted).

The term "person," for purposes of § 1983, includes a municipality. *See Monell v. Dep't of Soc. Servs.*, 98 S.Ct. 2018, 2035 (1978). A county fiscal court would qualify as a municipality under § 1983. *See Sartaine v. Pennington*, 410 F.Supp.2d 584, 590-91 (E.D. Ky. 2006).

Plaintiff's § 1983 claim is not simply defined. From the voluminous complaint and briefing, the Court ascertains that Plaintiff variously asserts Defendants: over-medicated Paul Rigney, with respect to Benadryl; failed to administer Rigney's prescribed medication; provided inadequate medical care by not taking Rigney to a hospital; abandoned formal CCDC procedures for obtaining outside medical care; improperly exercised authority over medical determinations; inadequately trained CCDC employees to care for ill inmates, particularly inmates suffering from alcohol and/or drug withdrawal; and provided insufficient medical staffing and procedures to monitor ill inmates.

15

The Defendants are Jailer Charles Marcum, Chief Deputy Jailer Bill Ed Sizemore, Clay County Judge-Executive James Garrison, and the Clay Fiscal Court.  The complaint charges Marcum, Sizemore, and Garrison individually and in their official capacities.

1.  Individual Capacity Suits

The Complaint does not name as Defendant's the individuals who were *directly* responsible for Paul Rigney's care–the CCDC medical staff.  Plaintiff instead names the municipal supervisors. Respondeat superior, however, is not a proper basis for § 1983 liability.  *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006).  To attach § 1983 liability to an individual municipal supervisor, the Sixth Circuit provides:

> There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Petty v. County of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007).  Thus, a supervisor's mere right to control employees, by itself, does not support § 1983 liability.  *See McQueen*, 433 F.3d at 470.

*Over- or under-medication claims*

Here, Plaintiff provides no facts to show that Marcum, Sizemore, or Garrison "directly participated in" dispensing Benadryl to Rigney.  *See Petty*, 478 F.3d at 349.  At best, Marcum knew that Dr. Becknell had a standing order that addressed withdrawal.  *See* DE# 53 Marcum Dep at 44. Dr. Becknell's order authorized the CCDC medical staff to administer Benadryl, although Marcum himself did not know what the order provided.  *See id*.; DE# 59 Exhibit 4 (Standing Orders).  Dr.

Becknell had issued the order pursuant to his authority under CCDC regulations.  *See* DE# 53

Exhibit 2 (Policy VIII-100 ¶ 1(f)).

      Furthermore, Plaintiff does not contend that the order itself permitted toxic or lethal

concentrations of Benadryl.  Plaintiff only suggests that Rigney received toxic amounts of Benadryl,

evidently erroneously administered by the medical staff.   Plainly, no evidence indicates that

Marcum, Sizemore, or Garrison personally administered the Benadryl, or that any Defendant

implicitly authorized the Benadryl treatment that Rigney actually received.  *See Petty*, 478 F.3d at

349.  Instead, the medical staff was ultimately responsible for Rigney's medical care, in accordance

with CCDC policy.  *See* DE# 53 Exhibit 2 (Policy VIII-100 & ¶ 1(f), providing that "medical

services" and "medical care . . . shall be delivered under the direction of a licensed Nurse," and that

"[a]ll medical procedures shall be performed according to written or standing orders issued by the

responsible medical authority").   Thus, even if Rigney's alleged over-medication resulted in a

constitutional violation, no supervisory liability would extend to Defendants.  *See Petty*, 478 F.3d

at 349.

      Additionally, the record is bereft of any causal link between administration of Benadryl and

any adverse effect on Rigney.   For a factual question outside the lay understanding of jurors, the

law requires expert testimony.  This plainly extends to the § 1983, Eighth Amendment context. *See,*

*e.g., Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006)(holding that, in § 1983 context, if

medical question "is not within the realm of lay understanding," i.e., concerns a matter regarding

a prisoner's "sophisticated medical condition," then "expert testimony is required to show proof of

causation"); *Roberson v. Goodman*, 293 F.Supp.2d 1075, 1081 (D.N.D. 2003)(noting requirement

of expert testimony "to establish causation between medical treatment and any alleged injuries" and

further stating that, as to medical claim, failure to offer any expert proof may lead to failure "to establish a prima facie violation of the Eighth Amendment"). Plaintiff offers no evidence to establish over-medication or any harm from over-medication.

Likewise, Plaintiff furnishes no competent evidence to show that Defendants directly withheld Rigney's blood pressure medication, or that Defendants knowingly acquiesced in that decision. *See Petty*, 478 F.3d at 349. The medical staff independently determined to withhold *some* of Rigney's blood pressure medication because the CCDC, in the view of Nurse Baker and then Dr. Becknell, lacked adequate documentation. *See* DE# 59 Baker Dep at 13, 26; DE# 59 Exhibit 1 (Inmate Progress Report); DE# 59 Exhibit 2 (Evaluation Form). Defendants had no personal involvement in securing the prescriptions, or in determining Rigney's treatment in the absence of the prescriptions.[16] *See Petty*, 478 F.3d at 349. Thus, whether and when the CCDC actually received the medical records is irrelevant as to Defendants and their liability as supervisors. Allegations and evidence of under-medication, even if the conduct represented an Eighth Amendment violation in this case, supports no claim against Defendants. *See Petty*, 478 F.3d at 349; *see also Mullins v Kalns*, 2000 WL 1679511, at *2 (6th Cir. Nov. 3, 2000)(rejecting liability against prison supervisor whose medical staff interfered with an inmate's prescribed medication).

---

[16]

Plaintiff alleges that Harlan County Jailer Curt Stallard contacted Defendant Bill Ed Sizemore and explained to Sizemore that Paul Rigney needed his blood pressure medication. *See* DE# 64 Oudia Rigney Dep at 101. If proven, the allegation may have tended to establish that Sizemore "knowingly acquiesced." *See Petty*, 478 F.3d at 349.

Plaintiff's allegation, however, is unsubstantiated hearsay. The parties did not depose Stallard, and Plaintiff postponed Sizemore's deposition without addressing the allegation. *See* DE# 75 Bill Ed Sizemore Dep. Thus, the Court may not consider Stallard's alleged comment to Plaintiff on summary judgment. *See* Fed. R. Civ. P. 56(e); *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 457 (6th Cir. 2004).

Further, and again, Plaintiff also tenders no evidence linking the denial of blood pressure medication to injury. No medical or expert proof provides or even rationally implies that Rigney's failure to receive Micardis over the incarceration period caused him harm. A lay post hoc, ergo propter hoc analysis simply does not suffice in the context of sophisticated medical assessment. *See Alberson*, 458 F.3d at 765-66; *see also Brightwell v. Lehman*, 2007 WL 2479682, at *4 (W.D. Pa. 2007)(noting, in medical context, requirement of "expert testimony linking Plaintiff's Eighth Amendment claims to any actual injury"). Plaintiff conceded at the pre-trial that the record, as it stands, simply does not support a valid link between any conduct by the Defendants and the death of Rigney.

*Hospitalization*

Plaintiff also claims that Defendants provided inadequate medical care, essentially because Defendants "refused" to take Rigney to the hospital for treatment. However, Charles Marcum is the only *Defendant* who actually considered whether Rigney needed outside medical treatment. The facts establish that Donna Jones reported Rigney's condition to Marcum on Sunday night, May 1. According to Jones, Marcum determined not to seek medical attention based on Jones's report, and remarked that Dr. Becknell would evaluate Rigney on Monday morning. *See* DE# 54 Jones Dep at 10, 24-25; *see also* DE# 59 Baker Dep at 11, 25.

Because of Marcum's decision and personal involvement, he would be liable under § 1983 if the determination to keep Rigney overnight violated Rigney's Eighth Amendment rights. *See Petty*, 478 F.3d at 349. To establish an Eighth Amendment violation, Plaintiff must satisfy both an objective and subjective component. *See Farmer v. Brennan*, 114 S.Ct. at 1977. Namely, the

19

inmate's alleged medical need must have been "objectively, sufficiently serious," and the prison official must have acted with "'deliberate indifference' to inmate health or safety." *See id*.

Under the objective prong, the key consideration is whether the inmate's medical need was "sufficiently serious." *See id*. In the Sixth Circuit, the "seriousness" evaluation hinges on the character of the injury or illness. In cases that involve "minor" or "non-obvious" medical needs, the § 1983 claimant must produce "verifying medical evidence" establishing that a delay in treatment had a detrimental effect. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004)(construing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001)). However, such "verifying medical evidence" is unnecessary if the injury or illness is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *See Blackmore*, 390 F.3d at 899-900. In that instance, it is sufficient if the inmate "actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *See id*. at 900.

Subjectively, the prison official must display "'deliberate indifference' to inmate health or safety." *See Farmer*, 114 S.Ct. at 1977. The Supreme Court formulated the "deliberate indifference" standard in *Farmer*, holding:

> [A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id*. at 1979. Under *Farmer*, the § 1983 claimant need not show that a prison official acted or failed to act "believing that harm *actually* would befall an inmate." *See id*. at 1981 (emphasis added). Rather, the subjective inquiry is whether the official had "knowledge of a *substantial risk* of serious harm." *See id*. (emphasis added). A fact finder may infer the requisite knowledge of a substantial

20

risk from the obviousness of the risk itself.  *See id*.

The Court need not ultimately address the objective element in this case because Plaintiff fails to satisfy the subjective prong.[17]  The record reflects that Donna Jones is the only person who reported anything about Rigney's condition to Marcum.  On Sunday, Jones told Marcum only that Rigney "was shaking really badly."  *See* DE# 54 Jones Dep at 10.  Jones testified that only Rigney's "hands" were shaking, and she said he was able to hold a coffee cup at the time.  *See id*. at 12.  She later felt she had been overreacting.  *See id*. at 10.  Jones's deposition testimony does not indicate that she relayed any further information, beyond Rigney's shaking hands, to Marcum.

---

[17]

Even if the Court reached the objective prong, Plaintiff submitted no "*verifying* medical evidence" to establish that a delay in medical attention had a detrimental effect on Rigney's health. *See Napier*, 238 F.3d at 742 (emphasis added). Thus, Plaintiff could satisfy the objective component only if Rigney's need for medical care was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *See Blackmore*, 390 F.3d at 899-900.

In *Speers v. County of Berrien*, 196 Fed. Appx. 390 (6th Cir. 2006), the Sixth Circuit explained that "general alcohol withdrawal, which typically may be managed in a prison setting and indeed frequently is managed there," is not a serious medical condition. *See id*. at 395. However, Rigney's withdrawal symptoms may not have been routine. *See id*. at 398.

The record offers a list of troubling characteristics that might establish a submissible jury question on the objective existence of a serious medical need. These include the following, derived from the summarized record: Rigney smashing an "unbreakable" window with a plastic cup while in observation; Rigney described as acting  incoherently over a long period; Rigney repeatedly "shaking" and "jerking"; Rigney requiring restraints; Rigney soiling himself; Rigney being agitated and mumbling; Rigney's condition being "too bad" for him to take Benadryl; and Rigney refusing to eat.  Certainly, courts have recognized that delirium tremens can qualify as a serious medical need. *See, e.g., Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).   However, the record does not establish a medical diagnosis of or contain an opinion concerning Rigney's condition during the incarceration.  Further, both Dr. Becknell and Nurse Baker saw Rigney and medically  determined no need for hospitalization or additional treatment.

Moreover, no other CCDC employee reported speaking to Marcum about Rigney, and Marcum himself does not recall any such discussions. *See* DE# 53 Marcum Dep at 53. Based on the very limited information that Marcum received, the facts do not establish that Marcum had "knowledge of a substantial risk of serious harm" to Rigney's health. *See Farmer*, 114 S.Ct. at 1979. Given the prevalence of some form of withdrawal by inmates at the CCDC, the limited report by Jones to Marcum–which is the only tie between Marcum and the treatment of Rigney–could not fairly support a question on the subjective *Estelle* prong. To create a jury question, Marcum had to actually draw the inference that Rigney faced a substantial risk of serious harm, and the record does not reasonably support such a finding.

The Sixth Circuit reached a similar result in *Speers v. County of Berrien*, 196 Fed. Appx. 390, 396-97 (6th Cir. 2006). In *Speers*, a deputy jailer informed the shift supervisor that an inmate was in withdrawal, but the plaintiff produced no other evidence to show that the supervisor had reason to appreciate the actual seriousness of the inmate's condition. The Sixth Circuit held: "By itself, the fact that [the supervisor] knew that [the inmate] was going through alcohol withdrawal, an occasional reality of life in a prison setting, does not establish a triable issue of fact over deliberate indifference." *See id*.

The reasoning in *Speers* also applies in this case. Jones's report to Marcum essentially suggested that Rigney was in withdrawal, and Marcum received no additional information to suggest that Rigney's condition was any more serious. As in *Speers*, Marcum could not have had "knowledge of a substantial risk of serious harm" to Rigney's health on these facts. *See Farmer*, 114 S.Ct. at 1979.

22

Furthermore, Marcum understood that Dr. Becknell and Nurse Baker evaluated Rigney on Monday morning and determined that Rigney was "alright." *See* DE# 53 Marcum Dep at 26. At that point, it appears Marcum's direct involvement and participation in the matter ended. After Monday morning, there is no evidence that Marcum (or the other Defendants) determined or even considered whether Rigney's condition required outside medical attention. Thus, § 1983 liability would not apply to any Defendant based on Rigney's medical care, or lack thereof, on Monday or Tuesday. *See Turner v. City of Taylor*, 412 F.3d 629, 645-46 (6th Cir. 2005)(finding no basis for § 1983 liability against a supervisor because "there is no evidence [that the supervisor] participated either directly or indirectly in the particular decision to not send plaintiff to the hospital"); *see also Ronayne v. Ficano*, 1999 WL 183479, at *3 (6th Cir. Mar. 15, 1999)("Supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care.").

### *Marcum's Medication Policy*

The Court has struggled with the effect of Marcum's specific medication policy concerning Xanax and narcotics. Nurse Baker testified that Marcum does not permit administration of Xanax and narcotics. *See* DE# 59 Baker Dep at 14-15. The record confirms that Baker initially withheld Rigney's prescribed Xanax "due to jail policy." *See* DE# 59 Exhibit 1 (Inmate Progress Report). Although no one questioned Marcum about the policy, the jailer has no medical training, and the policy evidently results from Marcum's non-medical opinion of such substances in the jail environment.

The notes of Baker and Becknell indicate that neither received the medical records of Rigney prior to his death. *See*, *e.g.*, *id.* Exhibits 1 and 2 (both Baker and Becknell indicating need for medical records). Still, Rigney undoubtedly arrived at the jail with prescriptions in hand for both

23

Xanax and Lorcet, a narcotic medication.  The CCDC's written policies indicate that an inmate with valid prescription medication will receive that medication as directed.  *See e.g.*, DE# 59 Exhibit 4 (Standing Order, regarding medications "as ordered on bottle by their physicians").  An inmate needing treatment not available at the CCDC is to be relocated.  *See* DE# 53 Exhibit 2 (Policy VIII-300 ¶ 9, indicating relocation to comply with medical instructions if inmate "cannot receive that treatment at the Jail").

Neither Baker or Becknell saw Rigney between his April 29 intake and Monday, May 2.  Thus, in that interim period, Marcum's non-medical policy blocked Rigney from access to prescription medications.[18]  Intentional deprivation of prescription medication may arise to the level of an Eighth Amendment violation.  *See, e.g., Estelle*, 97 S. Ct. at 291 (holding deliberate indifference exists when prison guards "intentionally interfer[e] with [a] treatment once prescribed"); *Loggins v. Franklin County*, 218 Fed. Appx. 466, 473 (6th Cir. 2007)("Loggins establishes the objective component of the deliberate indifference test because the deprivation of prescriptions [for antibiotics and pain medication] was a sufficiently serious need.").

Here, Marcum's categorical policy[19] led to denial of Rigney's prescribed Xanax and Lorcet

---

[18]

This applies only to the Lorcet and Xanax.  No Marcum policy prohibited administration of any of the other medications.

[19]

If Marcum's policy creates a substantial risk of harm to inmates, it is constitutionally suspect. Marcum himself would be accountable, even without knowledge of a particular inmate's needs, if the policy itself creates a "substantial risk of serious harm to a particular class of persons." *Taylor v. Michigan Dep't. of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995). While a policy forbidding administration of prescribed medications raises questions, the record here fails to address the probable effects of the policy on the inmate population, the medical alternatives available, or the nature and degree of risk from a blanket non-Xanax and non-narcotic rule.

medication in the period between intake and May 2. Despite that, and again based on the record as presented, the Court views summary judgment as proper.   The Court has repeatedly noted the absence of competent medical testimony in the case. Thus, nothing in the record fairly substantiates the basis or history for the prescriptions at issue, and no medical expert or physician indicates the seriousness of Rigney's need for that medication during the period.

Additionally, Plaintiff does not provide proof that Rigney's condition or behavior at the CCDC related to denial of the Xanax and/or Lorcet.  Indeed, much of Plaintiff's case (also not supported by expert medical evidence) seemingly depends on allegations related either to denial of blood pressure medication or administration of Benadryl.  Jail employees did perceive Rigney as being in withdrawal from something, but no one with medical expertise diagnosed an affirmative link between Rigney's condition and the Xanax/Lorcet issue at the time, or since.   Valid causal proof is a § 1983 requirement. *See Alberson*, 458 F.3d 765-66.  When causation involves principles "beyond the knowledge of the ordinary person, causation may only be established through competent, admissible expert testimony." *Gass v. Marriott Hotel Servs.,* 501 F. Supp.2d 1011, 1023 (W.D. Mich. 2007).

Baker placed Rigney on Dr. Becknell's standing protocol for "DT's," a regimen she described historically as concerning *alcohol* withdrawal.  *See* DE# 59 Baker Dep at 17.  Rigney, it must be noted, was an alcoholic and apparently drank 18-24 beers nightly prior to his conviction and sentence.  *See* DE# 59 Exhibit 7 (PA Miller Notes); DE# 64 Oudia Rigney Dep at 29.  Rigney's medical records suggest that he experienced alcohol withdrawal symptoms shortly before his incarceration when he reduced his intake to only 15 beers per night.  *See* DE# 59 Exhibit 7 (PA Miller notes).  What led to Rigney's condition and distress at the CCDC may have related to

25

Xanax/Lorcet, may have related to alcohol withdrawal, and may have related to blood pressure. Neither the Court or any lay jury can competently derive a conclusion on this record, and no expert has offered any light or opinion on this sophisticated medical question. Baker herself opined that discussion of withdrawal was only "a guess," and Dr. Becknell noted withdrawal as only "possible" at the time. *See* DE# 59 Baker Dep at 39 (describing suspicion of withdrawal: "That is just a guess, you know."); DE# 59 Exhibit 2 (Becknell evaluation noting "possible" withdrawal). The lack of valid causal proof forecloses this theory.

*Decisional Interference*

Plaintiff next asserts that Defendants are individually liable because Charles Marcum abandoned CCDC procedures and improperly exercised final authority over medical determinations. The CCDC's formal policy provides that the nurse's "instructions shall be followed" and that medical complaints "shall be referred . . . to the appropriate hospital emergency room for immediate examination/treatment" according to the nurse's direction. *See* DE# 53 Exhibit 2 (Policy VIII-300 ¶ 3). In emergencies, CCDC regulations again order detention officers to "comply with the facility's nurse instructions." *See id.* (Policy VIII-400 ¶ 5). Plaintiff, however, argues that outside emergency medical treatment customarily and improperly required Marcum's final authorization.

Whether CCDC employees actually needed Marcum's approval to obtain outside care is plainly in dispute. Baker, Jones, and some CCDC guards all testified that medical attention, beyond what the CCDC provided, "absolutely" required Marcum's authorization. *See* DE# 59 Baker Dep at 10, 27, 42-43, 45, 55; DE# 54 Jones Dep at 10, 17; DE# 55 Grubb Dep at 10-11; DE# 66 Sowders Dep at 9-10; DE# 72 Shepherd Dep at 21. However, Marcum testified that CCDC officials "always" deferred to the doctor or the nurse's assessment. *See* DE# 53 Marcum Dep at 57-58. Other CCDC

26

guards also believed that medical support could be contacted without Marcum's approval in serious emergencies. *See* DE# 56 Elbert Henson Dep at 9; DE# 65 Durham Dep at 12, 24; DE# 67 Brumley Dep at 17-18; DE# 68 Darnald Dep at 12; DE# 69 Allen Dep at 8; DE# 70 Terry Dep at 5; DE# 73 Roy Butler Dep at 14.

Even if Marcum had deviated from CCDC procedure in the past and denied medical care by exercising final authority over medical determinations, there is no evidence that Marcum personally interfered in this case. The facts show that Donna Jones moved Rigney to observation on Sunday May 1. *See* DE# 54 Jones Dep at 5; DE# 56 Exhibit 1 (Incident Report). Jones also contacted Nurse Baker. Baker directed Jones to administer Benadryl, in accordance with Dr. Becknell's standing orders, and advised Jones to send Rigney to the hospital if Jones was "uncomfortable." *See* Jones Dep at 23-25; DE# 59 Baker Dep at 11, 25-27, 46-47; DE# 59 Exhibit 4 (Standing Orders). Jones next reported Rigney's status to Marcum. *See* Jones Dep at 10, 24-25. Based on Jones's report, which apparently involved only information about Rigney's hands shaking, Marcum decided to keep Rigney for Dr. Becknell's evaluation on Monday morning. *See id.*; *see also* Baker Dep at 11, 25. Becknell did see Rigney on Monday, found his vitals normal, and entered a status quo order pending receipt of additional medical information. Neither Becknell or Baker ever determined that Rigney should be sent to the hospital.

These facts suggest compliance with CCDC procedures in this scenario. In cases of withdrawal, CCDC regulations direct the detention officer to move the inmate to an isolated holding cell, notify the nurse, and comply with the nurse's instructions. *See* DE# 53 Exhibit 2 (Policy VIII-400 ¶¶ 1(j), 2, 3, & 5). Here, Jones removed Rigney to observation, contacted Nurse Baker, and

administered Benadryl as Baker directed.  *See* Jones Dep at 5, 23-25; DE# 54 Exhibit 1 (Medical Request Form); DE# 56 Exhibit 1 (Incident Report); *see also* Baker Dep at 11, 25-27, 47.

Baker did advise Jones to send Rigney to the hospital if Jones was "uncomfortable."  *See* Baker Dep at 11, 25-27, 46-47.  However, the facts do not establish that Jones did anything more than report Rigney's condition to Marcum.  *See* DE# 54 Jones Dep at 24-25.  Ultimately, Marcum's decision to keep Rigney overnight was consistent with Nurse Baker's instructions to Jones.  Baker never ordered Jones to send Rigney to the hospital on Sunday.  In fact, neither Baker or Dr. Becknell indicated at any time that Rigney needed treatment at a hospital, even after the doctor's evaluation on Monday and Baker's checkup on Tuesday morning.  Thus, the record establishes compliance, and the Court finds no support for individual liability against Defendants based on Marcum's alleged interference in medical determinations.

*Training/Staffing Claims*

Plaintiff additionally claims that Defendants inadequately trained CCDC employees to care for ill inmates.  The Sixth Circuit recognizes that supervisors can be held individually liable on a failure-to-train theory if the failure constitutes deliberate indifference to an inmate's serious medical needs.  *See Walker v. Norris*, 917 F.2d 1449, 1455-56 (6th Cir. 1990); *Loy v. Sexton*, 132 Fed. Appx. 624, 628 (6th Cir. 2005); *Tate v. Coffee County*, 48 Fed. Appx. 176, 180 (6th Cir. 2002).  Although it involved municipal liability, the Sixth Circuit applies the framework in *City of Canton v. Harris*, 109 S.Ct. 1197 (1989), to evaluate failure-to-train claims in the context of individual capacity suits.  *See Norris*, 917 F.2d at 1455-56; *see also Loy*, 132 Fed. Appx. at 628.

According to the Supreme Court in *Harris*, the "focus" is on the "adequacy of the training in relation to the tasks that the particular officers must perform."  *See Harris*, 109 S.Ct. at 1206;

28

*Norris*, 917 F.2d at 1456.  Thus, in light of the employee's assigned duties, deliberate indifference exists when the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights."  *See Harris*, 109 S.Ct. at 1205.  Here, the record shows that all correctional officers obtained CPR certification and received sixteen hours of state-mandated training each year, which addressed inmate health and medical treatment.  *See* notes 13 & 15, *supra*; *compare Norris*, 917 F.2d at 1456.  State law objectively sets the annual requirement. *See* 501 KAR 3:040 § 4(2)("Jail personnel shall receive a minimum of sixteen (16) hours annual in-service training delivered by the department on a regional or local basis or approved by the department if delivered by another agency.").

Plaintiff argues that some employees could not recall whether the training sessions specifically discussed detoxification and alcohol/drug withdrawal.  *See* note 14, *supra*.  However, § 1983 liability does not exist merely because a particular officer's training is unsatisfactory.  *See Harris*, 109 S.Ct. at 1206.  Plainly, the record reflects that Defendants provided training that addressed inmate medical treatment.  *See* notes 13 & 15, *supra*.  Whether the officers could have had "better or more training" regarding alcohol/drug withdrawal in particular does not establish deliberate indifference.  *See id.*; *Norris*, 917 F.2d at 1456 (holding "the omission of instruction with regard to the . . . use of mace did not render the training program 'deliberately indifferent'" where prison officers had received state mandated training).

Finally, the Court finds that Plaintiff's staffing allegations are baseless.  The CCDC moved Rigney to an observation cell where CCDC guards could regularly monitor Rigney; a doctor visited the prison twice a week and actually evaluated Rigney; the facility had a full-time LPN who was also on-call and who twice examined Rigney; and another CCDC employee assisted the medical

staff on weekends and on some week-nights. Baker was aware of Rigney's condition and status, and she was involved in evaluating his circumstances throughout the weekend. The staffing decisions by the Defendant supervisors in this case did not display "deliberate indifference" to inmate medical needs. *See Smith v. Franklin County*, 227 F.Supp.2d 667, 673 (E.D. Ky. 2002)(rejecting § 1983 claim alleging, among other things, that a "doctor visited the jail only once a week . . . and that the nurse was to deal with those incidents arising at other times").

In sum, the Court finds that summary judgment for Defendants, in their individual capacities as to the § 1983 claims, is proper.

2.  Official Capacity Claims and Municipal Liability

Under federal law, Plaintiff's claims against Defendants in their official capacities and the Clay Fiscal Court are actually claims against Clay County itself. *See Petty v. County of Franklin*, 478 F.3d 341, 349 (6ᵗʰ Cir. 2007)(citing *Kentucky v. Graham*, 105 S.Ct. 3099, 3105 (1985)); *Sowders v. Daviess County Det. Ctr.*, 2006 WL 709580, at *9 (W.D. Ky. Mar. 21, 2006)(citing *Smallwood v. Jefferson County Gov't*, 743 F.Supp. 502, 503 (W.D. Ky. 1990)).

The Supreme Court decided in *Monell v. Dep't of Soc. Servs.*, 98 S.Ct. 2018 (1978) that municipalities are subject to § 1983. *See id.* at 2035. Per *Monell*, liability arises if a municipal policy or custom causes a constitutional injury. *See id.* at 2037-38. Thus, a § 1983 claimant must establish a constitutional violation and a "direct causal link" between the policy or custom and the alleged deprivation. *See Harris*, 109 S.Ct. at 1203.

In this case, Plaintiff does not challenge the CCDC's written policies regarding inmate medical care or emergency treatment. *See* DE# 76 Plaintiff's Response at 31 ("Marcum had set up a system that looked good based on the inmate orientation manual and the CCDC rules."). At best,

Plaintiff implies, without any formal legal analysis, that the CCDC had a "custom" of denying medical care because Charles Marcum–not the CCDC nurse–exercised final authority over urgent and serious medical determinations.

Plaintiff presents neither argument or analysis in support of charging the Fiscal Court with actions of Charles Marcum. Whether an individual could qualify as an entity's final policymaking authority is a question of state law. *See Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005). Under Kentucky law, a jailer is responsible statutorily for daily jail and inmate management. *See* KRS §§ 71.020; 71.060. However, the ultimate authority over a jail rests with the county's governing entity. *See* KRS § 441.045 (placing jail responsibility under "county governing body"). A jailer must report to said entity. *See* KRS § 441.105. In an underdeveloped theory, Plaintiff seems to assert that the reporting requirement somehow places the jailer in a position to bind the Fiscal Court. Based on the record and argument presented, the Court is unwilling to characterize Marcum as the final policymaking authority on the issues currently presented. *See Johnson v. Hardin County*, 908 F.2d 1280, 1287 (6th Cir. 1990); *Wimberly v. Leavell*, 1997 WL 135578, at *1 (6th Cir. Mar. 24, 1997). Plaintiff offers no testimony or evidence concerning the interplay between Marcum and the Fiscal Court, and state law suggests that the Fiscal Court, rather than Marcum, finally determines policy at the CCDC. *See Johnson*, 908 F.2d at 1287.

Plaintiff also claims that Clay County inadequately staffed and trained CCDC employees to care for and monitor ill inmates. The Court previously rejected the failure-to-train claim against Defendants in their individual capacities based on the standard in *Harris*. According to the Supreme Court, a municipality is liable for failure-to-train if, in light of the employee's assigned duties, "the

31

need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." *See Harris*, 109 S.Ct. at 1205.

Here, Plaintiff's failure-to-train arguments primarily rests on evidence that some CCDC employees could not recall whether the state-mandated training specifically addressed alcohol/drug withdrawal and detoxification. *See* note 14, *supra*. However, allegations that an officer is unsatisfactorily trained or that the officer could have received more or better training are insufficient to prove § 1983 liability. *See Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005); *see also Harris*, 109 S.Ct. at 1206. In this case, the record shows that all correctional officers obtained CPR certification and received sixteen hours of state-mandated training each year. *See* notes 13 & 15, *supra*; *compare Miller*, 408 F.3d at 816. Moreover, Plaintiff produces no evidence that the training was inadequate in light of prior incidents. *See id*. In the Court's view, the "need for more or different training" was not "obvious" on this record. *See Harris*, 109 S.Ct. at 1205.

Plaintiff's conclusory claim alleging inadequate staffing also fails for the reasons previously stated. The Court finds that summary judgment, as to Clay County, is appropriate

### State Law Claims

The complaint alleges state law causes of actions for wrongful death, negligence, and vicarious liability. On summary judgment, Defendants assert sovereign and official immunity, and alternatively argue that Plaintiff failed to establish medical causation. Plaintiff's response in opposition addresses only the § 1983 claim, and features no argument concerning the state law causes of action or immunity defenses. Therefore, the Court presumes that Plaintiff abandoned[20] the

---

[20]

At the pretrial, Plaintiff described any such abandonment as "inadvertent," a difficult proposition given the Defendants' plain arguments.

32

wrongful death and negligence claims.  *See Botnick v. Zimmer, Inc.*, 484 F.Supp.2d 715, 723 (N.D.

Ohio 2007); *see also Larimore v. Grant*, 2006 WL 2037390, at *1 n.3 (W.D. Ky. July 17, 2006).

      The supplemental jurisdiction statute confers discretion on a District Court concerning

retention of state law claims following dismissal of the basis for original jurisdiction.  *See* 28 U.S.C.

§ 1367(c); *Hankins v. Gap, Inc.*, 84 F.3d 797, 802 (6ᵗʰ Cir. 1996).  In *Carnegie-Mellon University*

*v. Cohill*, 108 S.Ct. 614, 619 n.7 (1988), the Supreme Court provided, "[I]in the usual case in which

all federal law claims are eliminated before trial, the balance of factors to be considered . . . will

point toward declining to exercise jurisdiction over the remaining state-law claims."  *See also Taylor*

*v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6ᵗʰ Cir. 1992) ("Generally, if the federal claims

are dismissed before trial, . . . the state claims should be dismissed as well.") (quoting *United Mine*

*Workers v. Gibbs*, 86 S.Ct. 1130, 1136 (1966) (quotation omitted)); *Robert N. Clemens Trust v.*

*Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6ᵗʰ Cir. 2007).

      Here, the record as to the state law theories is poorly-developed, particularly given Plaintiff's

failure to respond on the briefing.  As such, the Court perceives no basis for varying the normal rule

in this Circuit concerning the approach to supplemental claims following dismissal of the basis for

original jurisdiction.  The Court thus dismisses without prejudice Plaintiff's state law claims in

Counts II and III of the Complaint. *See Swiecicki v. Delgado*, 463 F.3d 489, 503 (6ᵗʰ Cir.

2006)("Concerning the dismissal of the remaining state-law claims, such a dismissal was in

accordance with the usual course of proceedings in this circuit."); *Brandenburg v. Hous. Auth. of*

*Irvine,* 253 F.3d 891, 900 (6th Cir.2001) ("[T]he usual course is for the district court to dismiss the

state-law claims without prejudice if all federal claims are disposed of on summary judgment.").

* * *

Therefore, for the reasons stated:

1.      The Court grants Defendants' motion for summary judgment as to all claims under § 1983,

        and said claims shall be dismissed with prejudice by separate judgment;

2.      The Court dismisses without prejudice any claims asserted against unknown and unidentified

        parties;

3.      The Court declines to exercise jurisdiction over the state law claims presented, and said

        claims shall be dismissed without prejudice by separate judgment; and

4.      This a final and appealable order.

        This the 11th day of October, 2007.

Signed By:

*Robert E. Wier*

United States Magistrate Judge